Adam M. Apton (SBN 316506)
**LEVI & KORSINSKY LLP**
Email: aapton@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel:  (213) 985-7290

*Attorneys for Plaintiffs Braden Van Der Wall*
*and Steven Romanoff and Lead Counsel for Class*

[*additional counsel on signature page*]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADEN VAN DER WALL and STEVEN ROMANOFF, on behalf of themselves and all other similarly situated persons,<br><br>           Plaintiffs,<br><br>    v.<br><br>ILLUMINA, INC., FRANCIS A. DESOUZA, and MARC A. STAPLEY,<br><br>           Defendants. | Docket No.:<br><br>**<u>CLASS ACTION</u>**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

1
COMPLAINT

Plaintiffs Braden Van Der Wall and Steven Romanoff ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Illumina, Inc. ("Illumina" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Illumina's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## <u>NATURE OF THE ACTION</u>

1.     This is a federal securities class action on behalf of a class consisting of all persons or entities, other than Defendants, Illumina's directors and officers, and their families and affiliates, who purchased or otherwise acquired Illumina common stock between July 26, 2016, and October 10, 2016, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning Illumina's revenue and sales for the third quarter of fiscal 2016. Defendants' statements included, among other things, that Illumina's pipeline of sales supported Defendants' decision to forecast revenue of $625 million to $630 million for the quarter and *increase* its earnings-per-share estimates from between $3.35 per share

and $3.45 per share to between $3.48 per share and $3.58 per share. Defendants' statements in this regard prompted an immediate and dramatic increase in the price of Illumina's common stock. From a closing price of $150.10 per share on July 26, 2016 at the start of the Class Period, Illumina's stock price climbed to $162.25 the following day on July 27, 2016 on unusually high volume.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, omitting to tell the public that Illumina's internal controls and forecasting processes were materially flawed. Prior to and during the third quarter of fiscal 2016, Illumina had been experiencing a material decline in sales of its traditional "HiSeq" sequencing instrument. The decline in sales, which Defendants would later refer to as a "trend" that had been "building" for some time and "didn't show up suddenly" during the third quarter, went unnoticed during the forecasting process. The fact that Defendants failed to account for this "trend" when providing investors with materially strong guidance shows that Defendants deliberately disregarded the "trend" during the Class Period and, therefore, acted with scienter.

4.     The truth emerged on October 10, 2016, when Illumina issued a press release announcing that third quarter revenue amounted to approximately $607 million, significantly lower than Defendants' previous forecast of $625 million to $630 million. Moreover, Defendants' revealed that the revenue shortfall was attributable to "a larger than anticipated year-over-year decline in high throughput sequencing instruments," which included the HiSeq instrument.

5.     Investors and analysts reacted immediately to Illumina's revelation. The price of Illumina's common stock declined dramatically. From a closing market price of $184.85 per share on October 10, 2016, Illumina's stock price fell to $138.99 per share on October 11, 2016, a decline of nearly 25% in the span of just

3

COMPLAINT

a single day. Illumina's disclosure on October 10, 2016 resulted in a market capitalization loss of over $6.6 billion.

6.     Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Illumina is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange,

## PARTIES

11.     Plaintiff Braden Van Der Wall purchased Illumina common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. A certification evidencing Mr. Van Der Wall's transactions in Illumina stock is attached hereto and incorporated herein by reference.

12.    Plaintiff Steven Romanoff purchased Illumina common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. A certification evidencing Mr. Romanoff's transactions in Illumina stock is attached hereto and incorporated herein by reference.

13.    Illumina, Inc. is a Delaware corporation with its principal executive offices located at 5200 Illumina Way, San Diego, California 92122. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "ILMN."

14.    Defendant Francis A. deSouza ("deSouza") was, at all relevant times, the President and Chief Executive Officer of Illumina.

15.    Defendant Marc A. Stapley ("Stapley") was, at all relevant times, the Executive Vice President, Chief Administrative Officer and Chief Financial Officer of Illumina.

16.    Defendants deSouza and Stapley are sometimes referred to herein as the "Individual Defendants."  Illumina together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Illumina's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified

herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     Illumina is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Illumina under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

**A.     Company Background**

20.     Illumina provides genetic sequencing products to customers in the medical, academic, and pharmaceutical industries. The company's products aid researchers in conducting DNA sequencing and analyzing genetic variations, among other things.

21.     Illumina's principal products during the Class Period consisted of the HiSeq X, HiSeq, NextSeq, and MiSeq. These products all perform "sequencing" functions, which Illumina describes as the process of determining the order of nucleotide basis in a DNA sample. For the fiscal years ended January 3, 2016, December 28, 2014, and December 29, 2013, sequencing revenue comprised 86%, 81%, and 73%, respectively, of Illumina's total revenues.

22.     Illumina's products also included devices known as arrays. Arrays also provide DNA analysis functions, but on a smaller scale than Illumina's "sequencing" devices. For the fiscal years ended January 3, 2016, December 28,

COMPLAINT

2014, and December 29, 2013, array revenue comprised 14%, 19%, and 27%, respectively, of Illumina's total revenues.

23.    Illumina introduced the HiSeq X and NextSeq systems in January 2014. The HiSeq X and NextSeq systems offered customers lower costs and more flexibility in terms of workflow, *i.e.*, customers were able to perform sequencing analyses without having to batch as many samples as they would have if they were using a traditional HiSeq device. According to Illumina, these devices offered "dramatic technology advances."

24.    Customers began favoring the HiSeq X and NextSeq devices almost immediately. In 2014, Illumina's instrument revenue increased by $190.7 million, or 51%, to $562.2 million in 2014 compared to $371.5 million in the prior year, driven primarily by shipments of sequencing instruments, in particular the HiSeq X and NextSeq systems introduced in January 2014. Illumina's consumables revenue also increased by $160.7 million, or 18%, to $1,041.0 million in 2014 compared to $880.3 million in the prior year, again largely due to growth stemming from the HiSeq X and NextSeq systems.

25.    In 2015, Illumina's revenue continued to grow in large part because of customers' preferences for the HiSeq X and NextSeq systems. Instrument revenue increased $32.5 million, or 6%, to $594.7 million in 2015 compared to $562.2 million in 2014, driven by shipments of HiSeq X and NextSeq systems.

26.    Illumina's customers continued to favor the HiSeq X and NextSeq systems into 2016. In 2016, instrument revenue increased $32.5 million, or 6%, to $594.7 million in 2015 compared to $562.2 million in the prior year, driven once again by shipments of HiSeq X and NextSeq systems.

27.    Defendants remained aware of the shift in consumer preference for the HiSeq X and NextSeq through fiscal 2016 and, in particular, the third quarter of fiscal 2016 (ended October 2, 2016). On May 3, 2016, several weeks prior to the

7

COMPLAINT

start of the third quarter, during an investor conference call discussing Illumina's earnings for the first quarter of fiscal 2016, Jay Flatley, Illumina's former Chief Executive Officer and current Executive Chairman, explained to investors that Illumina had missed its revenue guidance for the first quarter in part because of customers opting to purchase NextSeq systems instead of the company's traditional HiSeq devices. Flatley stated, in pertinent part, that:

> The second factor was HiSeq orders that were forecasted but were not received, accounting for $9 million of the shortfall. As a consequence, we shipped 19 fewer HiSeq 2500, 3000, and 4000 instruments than anticipated, valued at $14 million, which was partially offset by strength in other portions of the portfolio. We had anticipated sequential growth of 11 units, rather than a decline of 8 units, which led to flat placements year-over-year. Over the last several weeks, we've gone through a detailed analysis of the underlying drivers deal by deal.
>
> There were no dominant themes, but we do see a collection of factors including delays in funding release, ***customers opting to purchase NextSeqs***, and one-off situations such as pending lab moves, financing deliberations, contract reviews, or an upcoming regulatory audit. While outsourcing to service providers was also cited by a few customers, this is not a significant driver of our forward projections.

(emphasis added)

28.    Following the close of the third quarter, on November 1, 2016, Defendants confirmed that the "trend" had in fact continued through the third quarter. According to Defendants, the growing preference for the HiSeq X and NextSeq over the traditional HiSeq instrument was a growing "trend," one that had been "building" for some time and "didn't show up suddenly" during the third quarter.

29.    Notwithstanding Defendants' knowledge of this "trend," Defendants provided investors with revenue estimates that did not account for the material

negative impact that it was already having on the company's sales. Prior to the start of the Class Period, on May 3, 2016, Defendant Stapley told investors that Illumina was anticipating a "meaningful back-half acceleration" for fiscal 2016 with an "uptick in other HiSeq instrument shipments" in the second half of the year. Defendants affirmed these statements throughout the third quarter, even though they knew that HiSeq sales were declining.

30.     For example, during a presentation at the Morgan Stanley Global Healthcare Conference on September 13, 2016, Defendant Stapley reiterated projections provided earlier in the quarter that forecasted a sequential increase in sequencing instrument sales. Stapley made these statements with less than three weeks remaining in the third quarter of fiscal 2016. Consequently, Stapley (as well as deSouza and Illumina) was already aware that HiSeq sales had declined.

31.     Defendants provided the public with forecasts that were materially flawed and inaccurate. The forecasts failed to account for a trend that had already negatively impacted sales, and would continue to do so for the foreseeable future. Defendants, therefore, either failed to maintain adequate internal controls and forecasting processes that would account for the declining HiSeq sales or, alternatively, deliberately disregarded the fact that HiSeq sales were in the midst of a material decline.

**B.      Defendants Materially Misled Investors Concerning Illumina's Sales and Internal Controls.**

*July 26, 2016*

32.     On July 26, 2016, before the market opened, Illumina issued a press release announcing its preliminary earnings results for the second quarter of fiscal 2016 (ended July 3, 2016). The press release stated, in pertinent part, that:

9

"We delivered solid second quarter financial results with notable strength across our sequencing consumable and array portfolios," stated Francis deSouza, President and CEO. "We will continue to focus on our execution to deliver the sequential growth we are forecasting in the second half of the year. I would like to thank Jay Flatley for his leadership and strategic vision as CEO for the past 17 years and I look forward to his continued contribution in his new role as Executive Chairman of the Board of Directors."

**Updates since our last earnings release:**

- Received orders for more than 3 million samples of the new Infinium® Global Screening Array, a highly economical tool for genetic risk screening of large global populations

- Received a product approval certificate for the MiSeqDx® Instrument and the MiSeqDx Universal Kit with the Ministry of Food and Drug Safety (MFDS) in South Korea

- Appointed Jay Flatley Executive Chairman of the Board of Directors of Illumina and Francis deSouza President and CEO

- Appointed Paula Dowdy Senior Vice President and General Manager of commercial operations for Europe, the Middle East and Africa

**Financial outlook and guidance**

The non-GAAP financial guidance discussed below reflects certain pro forma adjustments to assist in analyzing and assessing our core operational performance. Please see our Reconciliation of Non-GAAP Financial Guidance included in this release for a reconciliation of the GAAP and non-GAAP financial measures.

***For fiscal 2016, the company continues to project approximately 12% revenue growth and non-GAAP earnings per diluted share attributable to Illumina stockholders of $3.48 to $3.58. For the third quarter 2016, the company is projecting revenue of $625 million to $630 million.***

(emphasis added)

33.     Illumina, also on July 26, 2016, hosted an investor conference call on July 26, 2016. Defendants deSouza and Stapley participated in the call on behalf of Illumina. During the call, deSouza and Stapley provided investors with detailed information concerning the company's new product orders and insight into the company's projection and forecasting process. These statements misled investors by failing to disclose material information concerning Defendants' inability to accurately project sales and revenue and, in particular with respect to the third quarter, how shifting customer preferences was negatively impacting the company's HiSeq sales and revenue guidance.

34.     During deSouza's opening remarks, he stated as follows:

Focusing now on new products, orders placed across our high throughput instrument portfolio increased sequentially, and shipments were roughly flat. HiSeq X orders exceeded our guidance range, and we added three new customers, bringing the total to 34. Again this quarter, demand came from new customers preparing to take part in the China PMI program, which has now allocated funding to more than 60 projects over the next three to five years.

In fact, Chinese customers drove the majority of our HiSeq X shipments in the quarter. ***Going forward, our HiSeq X outlook remains robust at 20 or 30 instrument orders per quarter, and we expect to see an increase in HiSeq placements in the Americas during the latter part of this year, which is supported by a solid pipeline***. Our benchtop instrument portfolio performed well in the quarter, driven by ramping interest in MiniSeq, NextSeq adoption for NIPT in the US and China, and lower than expected cannibalization of MiSeq.

Additionally, during the quarter, we received two regulatory approvals for our MiSeqDx instrument from the Ministry of Food and Drug Safety in South Korea, and from the Australian Therapeutic Goods Administration. These regulatory milestones will enable our customers to use our NGS technology in a clinical setting, and are examples of how our regulatory strategy is enabling markets globally.

COMPLAINT

(emphasis added)

35.    Stapley, in the course of his opening remarks, stated as follows:

Thanks, Francis. As Francis mentioned, total revenue grew 11% year-over-year to $600 million, slightly exceeding our quarterly guidance. This result was driven by growth in sequencing consumables, and strong demand from microarrays. ***Instrument revenue declined 19% year-over-year to $126 million, primarily due to a challenging HiSeq comparison, given the 3000 and 4000 launch in the prior year***.

Sequentially, instruments grew 7%, primarily driven by our benchtop portfolio. ***As predicted, HiSeq instruments were roughly flat sequentially, and we continue to expect to see an uptick in the second half, primarily Q4 in the Americas, as Francis mentioned***. Consumable revenue represented 63% of total revenue, to equal $379 million, an increase of 25% compared to the second quarter of 2015, driven by strength in both the array and sequencing product lines.

Sequencing consumables revenue also grew 25% year-over-year to approximately $310 million, driven by our growing installed base of instruments, and particular strength in NextSeq consumables. Again this quarter, NextSeq utilization was above our guidance range of $100,000 to $125,000 per instrument annually. As a result of this outperformance and our increasing forecasts, we are now projecting annual pull-through of $100,000 to $150,000 per NextSeq instrument.

MiSeq utilization was in our projected range of $40,000 to 45,000, and HiSeq pull-through per instrument fell within the guidance range of $300,000 to $350,000. ***For modeling purposes, we removed approximately 45 HiSeqs from our installed base in the second quarter, reflecting the units taken off-line due to adoption of newer machines***.

. . .

Turning now to expectations for the remainder of 2016. ***We continue to project total Company revenue growth of approximately 12% year over year.*** Included in this projection is the expectation that EMEA will experience a slower pace of recovery, which will be offset by an improved outlook in Asia-Pacific. ***We are forecasting Q3 revenue of***

12

COMPLAINT

***$625 million to $630 million, and are anticipating higher year-over-year growth in Q4 than in Q3. We have increased our non-GAAP EPS guidance to $3.48 to $3.58, up from $3.35 to $3.45, given our outperformance in Q2.***

(emphasis added)

36.     The statements identified above in emphasis were false and/or materially misleading. Defendants provided investors with the impression that they possessed the capability to accurately forecast sales and revenue. This was not true. By the time of the above-statements, only two months within the third quarter remained, *i.e.*, the third quarter was well underway. Customer preferences for newer HiSeq models had already begun to negatively impact the company's sales and revenue. As admitted by Defendants on November 1, 2016, the shift in preferences among Illumina's customers was a "trend" that had been "building" for some time, and "didn't show up suddenly this quarter [the third quarter]." Defendants' internal controls and forecasting processes either failed to account for the trend or, alternatively, Defendants deliberately ignored it. Notwithstanding, Defendants provided the public with their forecasts which portrayed Illumina's operations in a materially false manner.

37.     During the question-and-answer segment of the call, Defendants deSouza and Stapley perpetuated the false impression they gave to investors during their opening remarks. For example, even when asked directly by an analyst, deSouza failed to disclose the company's declining HiSeq sales due to shifting customer preferences, and how those shifting customer preferences were materially undermining Defendants' projections. deSouza stated, in pertinent part, as follows:

> <Q: Doug Schenkel – Cowen and Company – Analyst> Okay. Thank you, and good afternoon. Sequencing instruments were up against of the most difficult comparison of the year, so a pretty material decline

COMPLAINT

in instrument revenue. I believe it was expected in most models. For example we were expecting a 19% decline year-over-year.

That being said, based on the emails I'm getting from investors, it does seem like that 21% year-over-year decline in sequencing instrument revenue is jumping out at folks. I believe you indicated that bench tops were better than expected, HiSeq 2500 and 4000s were about flat sequentially, and that you exceeded the guidance range for HiSeq X orders in the quarter. It would be helpful if you could just provide any additional color on how sequencing instrument revenue performance was, relative to Q1, how it came in relative to your internal expectations, and maybe discuss any dynamics such as book-to-bill that will help us assess demand momentum heading into the second half?

<A: Francis deSouza> Sure, Doug. Overall, we are where we expected to be generally. ***With the instruments, we knew this was going to be a tough compare, and if you look at breakdowns with our instrument line for the HiSeqs, for example, we saw stabilization in the HiSeq instrument shipments in the second quarter. Orders were higher sequentially, and shipments were roughly flat compared to the first quarter. This was in line with what we outlined in the Q1 earnings call***.

***And then if you go to the X line, we continue to be happy with the strength of the X orders, which are as we expected it to be, and as we look at the pipeline going forward, we expect that to continue. If we look at the back half of the year, we expect to see further strength, especially in the HiSeq line, as we get towards the end of the year, and primarily coming out of the US.***

We have a good line of sight into our pipeline for the HiSeq instrument sales towards the end of the year, driven by end of year budget flush we expect to see. In terms of book-to-bill, it was roughly consistent with where it's always been, which means that orders and shipments were roughly in line.

(emphasis added)

38.    The statements identified above in emphasis omitted to provide investors with material information concerning the interplay in sales between

Illumina's traditional HiSeq model and NextSeq and HiSeq X instruments. Moreover, deSouza's statements failed to alert the public that Defendants' projection processes were materially flawed because they did not account for the fact that HiSeq sales were declining. To the contrary, deSouza represented that HiSeq sales were strong and supported Defendants' decision to increase Illumina's revenue guidance for the third quarter.

39.    Similarly, Stapley likewise omitted material information concerning the trend within the company's sequencing segment. In response to an analyst question directly addressing the issue, Stapley stated as follows:

> <Q: Bill Quirk – Piper Jaffray – Analyst> Understood. And then looking at the segment results here, and specifically a comment at the end of your prepared remarks about double-digit array guidance, but we kept the overall revenue guidance the same. And so how should we think about the offset here? It's obviously in sequencing.
>
> Is it specific to Europe? A little color would be great. Thank you.
>
> <A: Marc Stapley> Yes, Bill, so, obviously we don't guide to specific levels generally, specific segments generally. But we feel that given the trend that we're seeing now in arrays, we would give that perspective to you, that double-digit. We've been seeing that start to form. We mentioned it last quarter. We said it was an emerging bright spot, but we need to see a little bit more of a trend.
>
> With the orders that we saw last quarter and the quarter before, and the products this year, we had already been contemplating this potential array growth, we just didn't want to provide a number until we felt more comfortable, so it doesn't really change our guidance. ***And it doesn't offset necessarily on the sequencing side. Is been contemplated for --***
>
> <Q: Bill Quirk – Piper Jaffray – Analyst> Got it. Okay. Appreciate the color there. Thanks, Marc.

(emphasis added)

40.    Stapley, even when confronted directly on the issue of a potential weakness in sequencing instrument sales (which include the HiSeq), failed to disclose the shift in consumer preferences that had already begun to impact the company's sales in a materially negative manner. Further, while failing to disclose this information, Stapley continued to perpetuate the false impression that Illumina's forecasting processes and insight into its sales pipeline were sufficient in terms of providing investors with accurate information.

41.    In response to another analyst question on the same issue, deSouza and Stapley stated as follows:

<Q: Bryan Brokmeier – Cantor Fitzgerald – Analyst> You said that you're expecting strong HiSeq orders in the fourth quarter, and you cited the pipeline is why you believe that you can achieve that. Where in the sales cycle do you see a lot of opportunities that give you the confidence in your pipeline? In other words, have customers made the decision to purchase HiSeqs, but are waiting for funding applications to be accepted? Or where are customers -- or are they dragging their feet on committing to making in order?

<A: Francis deSouza> Yes. So, a little bit of all of the above. Typically, the people buying HiSeqs are not new to Illumina customers. Typically, we have been working with a lot of these customers already. ***We understand their business, and the demands on their business, and that's what allows us to project when we think they'll be needing instruments and work with them, on when they will need instruments.***

So, in some cases, it's grant applications that are in. In some cases, it's people that are looking at their budgets for the year and using their end of year budgets to buy HiSeqs. In some cases, they are just ramping up their business, and that's when they'll need the new instruments. But in the majority of cases, these are customers that are already customers of ours, and that we have been working with for a while.

<Q: Bryan Brokmeier – Cantor Fitzgerald – Analyst> Okay. And on a similar topic, you've removed 270 HiSeqs from your install base over the last year and half. Do you expect the rate of instruments that are

decommissioned to slow down later this year, when you're expecting that pick up in the HiSeq placements?

<A: Marc Stapley> *Actually it doesn't really matter as long as they are replacing those older HiSeqs with newer instruments. And so as Francis mentioned earlier, with respect to the utilization analysis we do, that we've seen an uptick in the available capacity, and so that's net of those reductions in older instruments. Even with that, we're seeing the capacity going up as customers buy the new higher throughput instruments. So, it's probably not fruitful to try to predict where that's going, to that's why it doesn't matter as long as it's replacement. Which is generally is.*

(emphasis added)

42.     deSouza's and Stapley's responses to the analyst question further misled investors by creating the false impression that Defendants possessed adequate forecasting processes as well as reliable information pertaining to the company's sales pipeline. This was not true. Defendants' forecasting processes either failed to adequately account for the declining HiSeq sales among Illumina's customers or, alternatively, Defendants deliberately ignored the declining sales. In either event, Defendants misled investors by providing the public with materially flawed revenue guidance.

43.     Defendants' false and/or materially misleading statements were material. Indeed, Defendants' statements on July 26, 2016 prompted an immediate rise in the price of Illumina's stock. From a closing price of $150.10 per share on July 26, 2016, Illumina's stock price climbed to $162.25 the following day on July 27, 2016 on unusually high volume. The truth about Illumina's revenue and Defendants' forecasting processes in particular would have altered the total mix of information available to investors. Defendants failed to disclose this information and, in so doing, allowed the statements they made to be materially misleading.

*August 2, 2016*

17

COMPLAINT

44.     On August 2, 2016, Illumina filed its quarterly report (Form 10-Q) for the second quarter (ended July 3, 2016) with the SEC. Defendant Stapley signed the quarterly report on behalf of the company.

45.     The quarterly report represented to investors that Illumina maintained adequate internal controls to "ensure" that the company complied with "applicable laws" and "established financial policies." In pertinent part, the quarterly report stated:

> We design our internal controls to provide reasonable assurance that (1) our transactions are properly authorized; (2) our assets are safeguarded against unauthorized or improper use; and (3) our transactions are properly recorded and reported in conformity with U.S. generally accepted accounting principles. ***We also maintain internal controls and procedures to ensure that we comply with applicable laws and our established financial policies.***
>
> Based on management's evaluation (under the supervision and with the participation of our chief executive officer (CEO) and chief financial officer (CFO)), as of the end of the period covered by this report, our CEO and CFO concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), are effective to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

(emphasis added)

46.     Defendants deSouza and Stapley also executed certifications pursuant to the Sarbanes-Oxley Act of 2002 in connection with the quarterly report. Each

18

COMPLAINT

certification represented to investors that the quarterly report was accurate in all material respects. Specifically, deSouza and Stapley certified that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Illumina, Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47.   The statements identified above in emphasis were materially misleading. Absent from the quarterly report and the accompanying certifications was any mention of the fact that Defendants' processes relating to forecasting sales and/or revenue were materially flawed. As explained previously, Defendants had provided projections to the public notwithstanding the fact that the projections were inaccurate—either because Defendants' forecasting processes failed to account for

declining HiSeq sales or because Defendants deliberately ignored the declining HiSeq sales.

48.     The truth concerning Defendants' forecasting processes, and the forecasts themselves, was material to investors. One of the objectives of the Sarbanes-Oxley Act of 2002 was to give investors assurance over transparency and accurate reporting. The certifications signed by deSouza and Stapley provided investors with a "personal stamp" of approval with regard to the company's disclosures, including Defendants' statements concerning future revenue and sales. Investors relied on these certifications as proof that Illumina's quarterly report and other public disclosures were accurate in all material respects. The truth about deSouza's and Stapley's certifications was material, as it would have altered the total mix of information available to the public.

<u>*September 13, 2016*</u>

49.     Illumina presented at the Morgan Stanley Global Healthcare Conference on September 13, 2016. Defendant Stapley participated in the conference on behalf of the company.

50.     During the presentation, Stapley reaffirmed Illumina's previously stated projections for the third quarter of fiscal 2016. In pertinent part, Stapley stated:

> *As we think forward into the second half here we've provided guidance on the second quarter earnings call that implied a sequential growth in Q3 and a sequential growth from that point into Q4 and part of that is driven by the backlog of HiSeq X's that we have now booked into our order system at this point in time; some of which is driven by strength in China and we [cited] 30 systems per quarter in Q3 and Q4 of HiSeq X; that's individual units of X.*

> In addition the fourth quarter growth we believe is driven by potentially upside in North America on the HiSeq and Europe on sequencing reagents driven by some element of year-end spending.

(emphasis added)

51.     Stapley's statements during the presentation, identified above in emphasis, materially misled investors. Similar to Stapley's comments during the July 26, 2016 conference call, Stapley again created the false impression that Illumina possessed the internal controls and insight into the company's sales pipeline to accurately project revenue. This was not true. To the contrary, Defendants' forecasting processes failed to account for weakening HiSeq sales in the third quarter, which by the time of the Morgan Stanley Global Healthcare Conference was within three weeks of ending. Significantly, as Defendants would later admit, the weakening HiSeq sales was attributable to a shift in consumer preferences that had been "building over time" and "didn't show up suddenly this quarter [the third quarter]."

52.     The truth about Illumina's forecasting processes and, in particular, the forecasts themselves was material to investors. Revenue is one of the most important metrics relied upon by investors when evaluating a company. Had investors known that Illumina's projections were inaccurate and that Defendants were incapable of developing accurate projections, investors would have taken different actions with regard their positions in Illumina stock. The truth about Illumina's projections and forecasting capabilities would have altered the total mix of information concerning Illumina stock available to investors.

**C.    Illumina Reveals that Third Quarter Earnings Will Fall Significantly Below Previous Estimates and that Defendants Do Not Possess the Controls Necessary to Provide Accurate Guidance.**

*October 10, 2016*

22

COMPLAINT

53.     On October 10, 2016, after the market closed, Illumina issued a press release announcing its preliminary earnings results for the third quarter of fiscal 2016 (ended October 2, 2016). The press release stated, in pertinent part, that:

> SAN DIEGO--(BUSINESS WIRE)--Oct. 10, 2016-- Illumina, Inc. (NASDAQ: ILMN) today announced ***estimated third quarter revenue of approximately $607 million***, a 10% increase compared to $550 million in the third quarter of 2015. This unaudited estimate, based on management's preliminary financial analysis, is ***lower than the third quarter revenue guidance of $625 million to $630 million***.

> The shortfall in quarterly revenue was driven by a larger than anticipated year-over-year decline in high throughput sequencing instruments. As a result, the company expects fourth quarter revenue will be flat to slightly up sequentially.

(emphasis added)

54.     Illumina hosted an investor conference call later the same day. Defendant deSouza participated in the call on behalf of Illumina. During the call, deSouza told investors that the shortfall in revenue was due to a "miss" in "high throughput instrument sales." deSouza also told investors that Illumina was anticipating "flat to slightly up" revenue for the following quarter. In pertinent part, deSouza stated as follows:

> Thanks, Rebecca, and good afternoon, everyone. We are clearly disappointed by the preliminary revenue result of approximately $607 million, an increase of 10% over the prior year period, and lower than our guidance of $625 million to $630 million. ***The primary driver of this miss was high throughput instrument sales, compared to our expectations. HiSeq 2500 and 4000 orders in the Americas were lower than expected, and we closed one less HiSeQ X system deal than anticipated, resulting in a shipment figure of 26 X units during the quarter. As a result, total sequencing instrument revenue declined 26% year over year, a larger decrease than that anticipated at the beginning of Q3.*** Sequencing consumables were generally consistent with our expectations.

. . .

> ***Our current expectation is that Q4 revenue will be flat to slightly up sequentially. We are no longer counting on the uptick on high throughput sequencing instruments that we were previously predicting, and there are a number of large, binary deals that may or may not close in the quarter.*** We plan to provide further details and insights as to the underlying dynamics for Q3 and Q4 on our earnings call.

(emphasis added)

55.    Investors and analysts reacted immediately to Illumina's revelation. The price of Illumina's common stock declined dramatically. From a closing market price of $184.85 per share on October 10, 2016, Illumina's stock price fell to $138.99 per share on October 11, 2016, a decline of nearly 25% in the span of just a single day. Illumina's stock price continued to fall on October 12, 2016, declining to $136.18 per share. Trading volume for both days was unusually high, reaching 11 million shares on October 11, 2016 and almost 3 million shares on October 12, 2016.

56.    A number of well-known analysts who had been following Illumina downgraded the company's stock and/or lowered their price targets in response to Illumina's disclosures. For example, Barclays lowered its price target for Illumina's stock, noting that the miss on revenue was due to Illumina's "weakness" in "high throughput sequencing" products. Barclays also identified Illumina's "uncertainty" concerning revenue in the fourth quarter as a basis for lowering its price target.

57.    Cowen and Company likewise lowered its price target for Illumina stock in response to the company's revelation. In its report, titled *3rd Miss In 5 Quarters Is Arguably Most Surprising & Problematic; PT To $160*, Cowen and Company wrote that "this [revenue miss] could be a new low given reset [sic] guidance and an 8K in July that seemingly de-risked non-heroic Q3 expectations."

58.    Wells Fargo also lowered its price target for Illumina stock. In its report, Wells Fargo focused on the fact that Illumina's disclosure was the "the third time in five quarters that [Illumina] has negatively pre-announced." The report also highlighted the fact that, "[e]ven more frustrating, however, is that the narrative [has been] different every quarter." In pertinent part, the Wells Fargo report stated that:

> In 3Q15, [Illumina] pre-announced negatively on weak desktop sequencing sales and weakness in Europe/APAC, offset by strength in the Americas and strong HiSeq sales. In 4Q15, [Illumina] positively pre-announced, citing strong desktop sequencing sales but simultaneously announcing the materially dilutive GRAIL initiative. In 1Q16, [Illumina] negatively pre-announced again, citing weaker standard HiSeq instrument sales and weakness in Europe. 2Q16 was a strong quarter due to arrays, strength in desktop, strength in China, and seemingly good visibility on HiSeq sales in H2. Now in Q3, the narrative shifts again, with the expected strength in HiSeq not materializing and now the Americas being the geographic problem area.

59.    The fact that these analysts, and others, discussed Illumina's revenue shortfall and missed projection shows that the investing public placed great weight upon Illumina's prior revenue and sales estimates. The frequent, in-depth discussion of Illumina's guidance confirms that Defendants' statements during the Class Period were material.

### *November 1, 2016*

60.    Illumina hosted an investor conference call on November 1, 2016. Defendants deSouza and Stapley participated in the call on behalf of Illumina. During the call, deSouza and Stapley identified several causes for the revenue shortfall announced initially on October 10, 2016. In pertinent part, deSouza stated as follows:

*. . . . **The other factor that contributed to the second-half shortfall was lower than anticipated HiSeq 2500 and 4000 orders, which we believe was driven by legacy HiSeq customers favoring the HiSeq X and NextSeq platforms**.*

The introduction of HiSeq X in January 2014 enabled whole genome sequencing to be performed much more economically, and as a result, samples have shifted to whole genome sequencing at the expense of other applications. Whole genome sequencing on HiSeq X now represents approximately 15% of all high throughput runs compared to 2% just two years ago.

Additionally, the release of NextSeq's v2 reagents in 2015 brought the quality on par with HiSeq. As a result, some high throughput customers have been adopting NextSeq, given its flexible work flow, which enables batching fewer samples and attractive operating costs. ***As a result, we will not see the second half uptick in high throughput instrument place placements we had previously expected***.

***To better identify trends like this earlier, we have initiated a global forecast improvement project, which I have asked Marc to lead, that will enhance both our visibility and forecast accuracy. Over time we are relatively indifferent to these shifts, as in both of these cases, the lower operating costs of HiSeq X and NextSeq enables our customers to sequence more samples. However, the timing of the elasticity taking effect, or the customer completing their transition varies across customers, and can create a temporary dip in spending.***

(emphasis added)

61.   Later in the call, during the question and answer segment, analysts asked Defendants deSouza and Stapley for additional information concerning the revenue shortfall. Defendants stated as follows:

<Q: Tycho Peterson – JP Morgan – Analyst> More color on HiSeq consumable miss. You ruled out a number of things. There's certainly some lingering questions as to whether this is a blip, or going to be more persistent.

<A: Francis deSouza> We spent, as I said in the script, a bunch of time analyzing what was a driver of this miss. One of the questions we had internally was, is there an overcapacity in the market, and we looked at the utilization of those instruments. One of the analyses we did was look at customers who had just HiSeqs, and the 2500s, and look at what their utilization patterns were doing, and those patterns continue to be stable. So, we're not seeing a change in the utilization of the HiSeqs in the market, at all. ***So what we are seeing is, as people are making choices around which high throughput instrument to go for, historically where they would have gone for a HiSeq, we're seeing some customers now go to an X for their whole genome work, and in some cases to a NextSeq.***

. . .

<Q: Amanda Murphy – William Blair & Company – Analyst> Just had a couple questions here, on some commentary you've made. First on the NextSeq, you mentioned that there's work flow benefits to that platform. Could you just give us a little more detail around what types of applications you're seeing shifting to the NextSeq? Is this something that's been going on for some period of time, and is there anything that you can leverage from that platform into other platforms, to drive increased performance?

<A: Francis deSouza> Yes. So one application that is starting to -- we're getting a lot of traction on NextSeq on, is NIPT. ***We see a lot of our customers that are running LVTs move to the NextSeq. What they like is the flexible work flows. They like the fact they don't have to batch as many samples as they would have to, with the HiSeq.***

***And that's a phenomenon that's been building. And so it's been -- it's didn't show up suddenly this quarter. It's been building over time.***

I think it was important, the v2 chemistry was an important step for us with the NextSeq, where there was an initial period, where people were looking to see the quality of the runs on NextSeq compared to the other instruments, the four channel instruments. With the v2, customers started to get comfortable that we had achieved parity in the quality of the output that they could get, and they started trialing those instruments and validating them. ***And so this was a trend that's been building.***

COMPLAINT

. . .

<Q: Bill Quirk – Piper Jaffray & Co. – Analyst> Two quick interrelated questions. First, Marc, would you be so kind to elaborate on the new forecasting project, and I'm thinking maybe you could give us an example of a process that will be changed as a result of this? And then again somewhat related, just help us think a little bit about -- what would potentially stopped additional customers from transitioning to other platforms and obviously disrupting your consumables flow, like we saw in this quarter? Thanks.

<A: Marc Stapley> I would say on the forecasting project, I think of it in terms of both our visibility and predictability of the pipeline. So there are a number of different things that we can do, including connecting the market insights that we have, as well as improving the market insights that we have, and connecting those to the forecasted pipeline. And driving more discipline around our CRM database, around our pipeline definitions and so on.

It's much broader than just forecasting, which is why I said this could continue into next year. It's between the sales process and the forecasting process, itself. We might need to make changes in both areas.

I think we do it really well in certain spots, in a number of regions. And as we've always said, we felt like Americas had a very disciplined process. But I think we don't do it as consistently globally as we probably -- as I know we can.

So driving global consistency and the way that we do it, the items we look at, the dashboards we use, even the taxonomy. What do you mean by defining opportunity versus upside, and those kinds of things. Like I say, in some places, we do that really well but I'd like to drive more global consistency around that.

And then your second question on transitions, I think generally, it's okay for us, if our customers are transitioning to other products and platforms. There's normally good reason for that, and we still believe in elasticity, and over time, that revenue comes back. The fact that it causes a dip, as those customers transition, I think is part, goes with the territory.

COMPLAINT

*And so key there, again, back to the forecast process, is our ability to predict that, versus being surprised by that. But the actual dynamic itself, I don't think is one we need to worry about, as long as our customers don't take multiple years to transition, which would be more damaging to their business than it is to ours.*

(emphasis added)

62.    Defendants' statements show that the revenue shortfall in the third quarter of fiscal 2016 was due, in large part, to a trend in which customers had been transitioning away from Illumina's traditional HiSeq model to NextSeq and HiSeq X instruments. As Defendants stated, Illumina's customers preferred the lower operating costs and more flexible workflows associated with the NextSeq and HiSeq X instruments. Defendants admitted, during the November 1, 2016 conference call, that this transition was a "trend" that had been "building" for some time. As deSouza stated, the transition was a "phenomenon that's been building" and "didn't show up suddenly this quarter." "It's been building over time," deSouza told investors.

**D.    Defendants Acted with Scienter**

63.    The materially false and misleading misrepresentations and omissions alleged herein were made by Defendants with scienter. Defendants provided the public with revenue and sales forecasts while knowing that Illumina's forecasting processes were materially flawed. In so doing, Defendants acted with deliberate recklessness as to the risk of misleading investors.

*Defendants Routinely Provided the Public with Flawed Guidance*

64.    Illumina has a demonstrated history of providing flawed guidance to investors and analysts. The guidance provided for the third quarter of fiscal 2016 marked the third time in the company's most recent five quarters that guidance was materially inaccurate.

65.    In an analyst report, Wells Fargo chronicled Illumina's flawed forecasting processes as follows:

> In 3Q15, [Illumina] pre-announced negatively on weak desktop sequencing sales and weakness in Europe/APAC, offset by strength in the Americas and strong HiSeq sales. In 4Q15, [Illumina] positively pre-announced, citing strong desktop sequencing sales but simultaneously announcing the materially dilutive GRAIL initiative. In 1Q16, [Illumina] negatively pre-announced again, citing weaker standard HiSeq instrument sales and weakness in Europe. 2Q16 was a strong quarter due to arrays, strength in desktop, strength in China, and seemingly good visibility on HiSeq sales in H2. Now in Q3, the narrative shifts again, with the expected strength in HiSeq not materializing and now the Americas being the geographic problem area.

66.    Illumina has demonstrated an inability to properly forecast revenue and/or sales. Regardless of the particular reason behind the company's failures, the fact remains that Illumina did not have the internal controls in place to properly forecast revenue and/or sales.

67.    Defendants deSouza and Stapley were aware of Illumina's past inability to issue accurate guidance, as each defendant has been employed with Illumina since at least 2013. deSouza joined Illumina as its President in 2013 and Stapley has served as Illumina's Executive Vice President, Chief Administration Officer and Chief Financial Officer since 2015. Given each defendant's senior positions within the company, they were directly involved with, responsible for, and aware of Illumina's history of inaccurate guidance. deSouza's and Stapley's knowledge in this regard is imputed to Illumina.

68.    Defendants' scienter in the matter at hand is evident from the fact that they provided investors with guidance for the third quarter of 2016 while knowing

that the guidance was the product of flawed internal controls that had previously provided inaccurate guidance on numerous occasions.

### *Defendants Knew that Illumina's HiSeq Sales Were Declining*

69. Defendants revealed at the end of the Class Period that they had been aware of a developing trend among Illumina's customers. This "trend," as described by Defendants, began almost immediately following the introduction of the company's HiSeq X and NextSeq systems.

70. The HiSeq X and NextSeq systems offered customers lower costs and more flexibility in terms of workflow, *i.e.*, customers were able to perform sequencing analyses without having to batch as many samples as they would have if they were using a traditional HiSeq device. According to Illumina, these devices offered "dramatic technology advances."

71. Statements made prior to and after the third quarter show that the HiSeq sales were declining during the third quarter. On May 3, 2016, several weeks prior to the start of the third quarter, during an investor conference call discussing Illumina's earnings for the first quarter of fiscal 2016, Jay Flatley, Illumina's former Chief Executive Officer and current Executive Chairman, explained to investors that Illumina had missed its revenue guidance for the first quarter in part because of customers opting to purchase NextSeq systems instead of the company's traditional HiSeq devices. Then, on November 1, 2016, several weeks after the close of the third quarter, Defendants admitted that the growing preference for the HiSeq X and NextSeq over the traditional HiSeq instrument was a growing "trend," one that had been "building" for some time and "didn't show up suddenly" during the third quarter. deSouza, in particular, described the shifting preference within its customer base as a "phenomenon that's been building. And so it's been -- it's didn't show up suddenly this quarter. It's been building over time."

72.     Despite being aware of this "trend," Defendants' revenue forecasts failed to account for it. Even as late as September 13, 2016, with less than three weeks remaining in the third quarter, Defendant Stapley reaffirmed Illumina's revenue forecast of $625 million to $630 million and decision to *increase* its earnings-per-share to $3.48 per share to $3.58 per share from $3.35 per share to $3.45 per share.

*Defendants Deliberately Disregarded Illumina's Declining HiSeq Sales When Providing the Public with Guidance for the Third Quarter of Fiscal 2016*

73.     Defendants claimed that they actively monitored Illumina's pipeline during the third quarter of fiscal 2016. For example, during the July 26, 2016 investor conference call, deSouza described for analysts the process by which Illumina tracked its sales opportunities. In pertinent part, deSouza stated that:

> And when Scott first went out there at the beginning of Q2, we asked him to look through the pipeline and validate the strength of that pipeline. And his response, and in his report back to us, was that the deals in the pipeline are real. Those are real opportunities for us, and three months in, those are real, in fact we've added to that pipeline.

74.     Later in the call, deSouza elaborated in particular on Defendants' processes for tracking sales of the HiSeq instruments. In pertinent part, deSouza stated that:

> We have a good line of sight into our pipeline for the HiSeq instrument sales towards the end of the year, driven by end of year budget flush we expect to see. In terms of book-to-bill, it was roughly consistent with where it's always been, which means that orders and shipments were roughly in line.

75.     Again, in response to an analyst question, deSouza confirmed that Illumina actively monitored its sales pipeline. In pertinent part, deSouza stated that:

> Sure. Let's talk about both. In terms of our guidance for the year, the reason we feel confident with 12%, even though I said that we're

COMPLAINT

looking at the big deals in Europe and applying a probability-based view on them is that we are seeing slightly stronger than expected pipelines coming out of both the Americas and forecast coming out of both the Americas and Asia. We in general do apply some probability weighting to deals across the globe, but we have leaders that have been in place longer in EMEA and in APAC, and so we feel like we have a much better handle on where those deals are, and what their likelihood of closing is.

We applied a little bit of a heavier weighting, probability weighting in Europe than we do right now in the Americas and in APAC, until we have the team on the ground and have some track record behind us, in terms of the forecasting there. But the strength in Asia and Americas, they more than compensate for that, from our perspective.

76.     Defendants closely analyzed its sales opportunities throughout the third quarter. Notwithstanding, Defendants failed to account for Illumina's declining HiSeq sales when providing investors with guidance for the third quarter. The fact that Defendants' guidance failed to account for the HiSeq sales shows that either Illumina's forecasting processes were materially flawed or Defendants deliberately ignored the fact that HiSeq sales were declining. In either event, Defendants acted with scienter when making the false and/or materially misleading statements and omissions identified above.

*Illumina Implemented Significant Remedial Measures*

77.     Following its revenue shortfall for the third quarter of fiscal 2016, Illumina implemented significant measures to remedy its deficient internal controls and forecasting processes.

78.     In particular, as described by Defendants during the November 1, 2016 conference call, Defendants told investors that they would be initiating a "global forecast improvement project" led by Defendant Stapley. deSouza stated, in pertinent part, as follows:

To better identify trends like this earlier, we have initiated a global forecast improvement project, which I have asked Marc [Stapley] to lead, that will enhance both our visibility and forecast accuracy. Over time we are relatively indifferent to these shifts, as in both of these cases, the lower operating costs of HiSeq X and NextSeq enables our customers to sequence more samples. However, the timing of the elasticity taking effect, or the customer completing their transition varies across customers, and can create a temporary dip in spending.

79.    Defendants' "global forecast improvement project" was not the first time Illumina sought to overhaul its forecasting abilities. In particular, during an investor conference call on May 3, 2016 following a revenue miss in the first quarter of 2016, deSouza described Illumina's ongoing efforts to improve the company's forecasting processes. In response to an analyst question, deSouza stated the following:

<Q: Tycho Peterson – JPMorgan – Analyst> Thanks. Starting to hone in on the Europe issues, but I just would love to hear from you a little bit more about the steps you're taking to improve your forecasting ability. Obviously, you had issues in Europe in 3Q last year as well, so if you could just talk a little bit about how you intend to improve visibility there, and really what gives you the confidence that the problem's going to be fixed by 3Q, since the back half estimates are essentially unchanged to get to the mid point of the new guidance range?

<A: Francis deSouza> Sure, Tycho, this is Francis. There are a number of things we are doing. We started by moving one of our strong leaders from the US who ran the Western region, Scott Thomas, out to Europe, and he was out there at the beginning of this quarter, and has already started rolling out a much more disciplined sales process, and that starts all the way from capturing the opportunity, then tracking the opportunities, as well as managing our visibility into the opportunities that are in various stages of the process.

He's also instituted a process that frankly we use in the US, around managing the pipeline for some of our lower-end instruments. That alone has started to give us better visibility into when deals are expected

COMPLAINT

to close over the course of this quarter, and allowed us to add urgency, and also manage more for a weekly close process, rather than a close process that's so heavily tailored towards the end of the quarter.

That does a few things. One, it gives us much better visibility into what we're working, for the course of the quarter. It helps drive urgency into the team, and it helps make sure that we understand whether we have the pipe to get the deals we need.

Additionally, Tycho, the execution challenges that we've talked about in Europe, much of that related to this deferral challenge that I talked about in the script where we had a surprisingly large amount of revenue that was not recognizable, and part of the discipline we need in the team is to pull in the orders to make sure that we don't have a lot of systems that don't get shipped in time to be recognized as revenue, or they're small contractual issues at the end of the quarter, that wind up having a revenue recognition question, and therefore can't be counted. That's all the discipline of making sure that hose deals get closed earlier in the quarter, and Scott's going to make a big difference there as well, we believe.

80.    Stapley elaborated upon deSouza's remarks, stating in pertinent part that:

I would add one point to your question about confidence in the outlook for the rest of the year. As I mentioned in the script, or Francis mentioned, we've got Europe in our outlook currently at the revised number that they've committed to, and provided recently, which is a lot lower than it was previously. And so that gives us an opportunity to get these changes and improvements baked in, and start to get some positive impacts from them.

81.    The implementation of such a significant overhaul to the company's forecasting processes, in addition to the measures already implemented prior to the third quarter, shows that the forecasting processes utilized by the company previously were grossly inadequate. The significance of the remedial measures implemented by Illumina further shows that the false and/or misleading revenue

estimates provided to the public by Defendants were not the result of mismanagement, but deliberate recklessness and/or intentional fraud.

### *Corporate Scienter Is Imputed to Illumina*

82. Illumina's public statements about its revenue for the third quarter of fiscal 2016 were critical to the company's reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Illumina's corporate officials knew of the falsity of the statements at the time of publication and/or dissemination. Specifically, the knowledge of deSouza and Stapley (among other members of senior management) concerning Illumina's past statements of inaccurate guidance, ongoing trend of declining HiSeq sales, and the need for a significant overhaul of Illumina's forecasting processes is imputed to Illumina. Illumina acted with scienter under the corporate scienter doctrine.

**E.    Loss Causation and Economic Loss**

83. During the Class Period, as detailed herein, Illumina and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Illumina's common stock and operated as a fraud or deceit on Class Period purchasers of Illumina's common stock by materially misleading the investing public. Later, when Illumina and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Illumina's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Illumina's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

84. Illumina's stock price fell in response to the corrective event on October 10, 2016, as alleged *supra*. On October 10, 2016, Defendants disclosed

information that was directly related to their prior misrepresentations and material omissions concerning Illumina's forecasting processes and third quarter sales.

85.     In particular, on October 10, 2016, Illumina revealed that third quarter revenue amounted to approximately $607 million, significantly lower than Defendants' previous forecast of $625 million to $630 million. Moreover, Defendants' revealed that the revenue shortfall was attributable to "a larger than anticipated year-over-year decline in high throughput sequencing instruments," which included the HiSeq instrument. Further, on November 1, 2016, Defendants elaborated, explaining that the decline in high throughput sequencing instruments was due to a growing "trend" among Illumina's customers. According to Defendants, the company's customers had been demonstrating a growing preference for the HiSeq X and NextSeq over the traditional HiSeq instrument, and that this preference was a growing "trend" that had been "building" for some time. These disclosures communicated to the public that Defendants did not have adequate forecasting processes and, as a result, failed to properly account for the decline in HiSeq sales. Defendants' misrepresentations and material omissions during the Class Period concealed this information.

86.     The disclosure on October 10, 2016 prompted an immediate, material decline in the price of Illumina's stock as investors discovered the truth about Illumina's forecasting processes. On October 10, 2016, the price of Illumina's common stock declined dramatically. From a closing market price of $184.85 per share on October 10, 2016, Illumina's stock price fell to $138.99 per share on October 11, 2016, a decline of nearly 25% in the span of just a single day. Illumina's stock price continued to fall on October 12, 2016, declining to $136.18 per share. Trading volume for both days was unusually high, reaching 11 million shares on October 11, 2016 and almost 3 million shares on October 12, 2016.

COMPLAINT

**F.     Presumption of Reliance; Fraud-On-The-Market**

87.     At all relevant times, the market for Illumina's common stock was an efficient market for the following reasons, among others:

(a)     Illumina's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Illumina communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Illumina was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Illumina was reflected in and incorporated into the Company's stock price during the Class Period.

88.     As a result of the foregoing, the market for Illumina's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Illumina's stock price. Under these circumstances, all purchasers of Illumina's common stock during the Class Period suffered similar injury through their purchase of Illumina's common stock at artificially inflated prices, and a presumption of reliance applies.

89.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not

a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## G.   No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

90.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with forecasts while at the same time failing to maintain adequate forecasting processes. HiSeq sales were in the midst of a decline prior to and during the third quarter of fiscal 2016. Notwithstanding, Defendants provided the public with forecasts that failed to account for this decline and/or adequately disclose the fact that the company at the current time did not have adequate forecasting processes.

91.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

92.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Illumina who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by

the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

93.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Illumina's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

94.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Illumina's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Illumina or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of August 2, 2016, the date of the Company's last quarterly or annual report within the Class Period, there were 146.6 million shares of the Company's common stock outstanding. Upon information and belief,

these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

95.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

96.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Illumina;

(c)     whether the Individual Defendants caused Illumina to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Illumina's common stock during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

COMPLAINT

98.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

## COUNT I
### Against All Defendants
### for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

99.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

100.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

101.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including

Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Illumina common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Illumina's common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

102. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Illumina's common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

103. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

104. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As

the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Illumina's internal affairs.

105.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Illumina's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Illumina's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Illumina's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by defendants, and were damaged thereby.

106.    During the Class Period, Illumina's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Illumina's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases

44

COMPLAINT

and/or acquisitions by Plaintiffs and the Class, the true value of Illumina's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Illumina's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

107.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108.   As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants and Illumina
### for Violations of Section 20(a) of the Exchange Act

109.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Illumina's misstatements.

111.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information,

and to correct promptly any public statements issued by Illuminia which had become materially false or misleading.

112.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Illumina disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Illumina to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Illumina's common stock.

113.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Illumina to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

114.   By reason of the above conduct, the Individual Defendants and/or Illumina are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

COMPLAINT

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 4, 2018                **LEVI & KORSINSKY LLP**

Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Fax: (202) 333-2121
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

47

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt (DC 457611) (NY 2798460)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com

*Attorneys for Plaintiffs Braden Van Der Wall and Steven Romanoff and Lead Counsel for Class*

COMPLAINT

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
BRADEN VAN DER WALL and STEVEN ROMANOFF, on behalf of themselves and all other similarly situated persons,

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Levi & Korsinsky, LLP
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071

## DEFENDANTS
ILLUMINA, INC., FRANCIS A. DESOUZA, and MARC A. STAPLEY

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 78j(b) and 78t(a); 17 C.F.R. §240.10b-5
Brief description of cause:
Violations of the Securities Exchange Act of 1934

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE Hon. M. James Lorenz
DOCKET NUMBER 3:16-CV-03044-L-KSC

DATE
10/04/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Adam M. Apton

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____